<u>**NOT FOR PUBLICATION**</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| ULTRAFLEX SYSTEMS, INC., A New Jersey Corporation, ULTRAFLEX EUROPE, LTD., a company organized under the laws of Great Britain, ULTRAFLEX BRASIL, LTD., a company organized under the laws of Brazil, and ULTRAFLEX ECUADOR, a company organized under the laws of Ecuador,<br><br>        Plaintiffs,<br><br>   v.<br><br>VERSEIDAG-INDUTEX GmbH, a company organized under the Federal Republic of Germany,<br><br>        Defendant. | Civil Action No.: 01-129 (JLL)<br><br><br><br><br><br>**O P I N I O N & O R D E R** |

LINARES, District Judge.

This matter comes before the Court on the motion of Defendant Verseidag-Indutex GmbH (hereinafter "Defendant" or "Verseidag") for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all Counts of Plaintiffs' Ultraflex Systems, Inc., Ultraflex Europe, Ltd., Ultraflex Brasil, Ltd., and Ultraflex Ecuador (hereinafter collectively "Plaintiffs" or "Ultraflex") Amended Complaint (hereinafter "Complaint") and for partial summary judgment on Verseidag's Counterclaim. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 1441(b). This matter was removed from the Superior Court of New Jersey,

1

Chancery Division, Morris County, pursuant to 28 U.S.C. § 1446, on January 10, 2001.  The

Court decides this motion without oral argument pursuant to Rule 78 of the Federal Rules of

Civil Procedure.  For the reasons that follow, Verseidag's motion for summary judgment is

DENIED with respect to Counts IX and XII, GRANTED with respect to Counts I, II, III, IV, V,

VI, VII, VIII, X, and XI, and GRANTED in part and DENIED in part with respect to Verseidag's

Counterclaim.

## B A C K G R O U N D

_____The parties are quite knowledgeable about the underlying facts, therefore the facts need

not be reiterated in full for purposes of the present motion.  The relevant undisputed facts,

however, will be discussed below and in more length in the appropriate legal discussion.

This case arises from a long standing manufacturer-distributor relationship between

Defendant Verseidag and Plaintiff Ultraflex Systems Inc. and its affiliated companies

("Ultraflex").  Around 1987, John Schleicher, Sr. ("John Sr."), President of Ultraflex,

approached Verseidag about manufacturing certain textiles for use in the sign making industry.

Together they developed a product called 'Ultralac,' which Verseidag agreed to manufacture and

Ultraflex to market.  In April 1989, the two companies entered into an agreement in which

Verseidag became the exclusive manufacturer and Ultraflex the exclusive distributor in North

America for a period of three years.  In 1991, before the 1989 agreement expired, the parties

entered into a second contract to run from July 1, 1991 to July 1, 1996 for the global exclusive

marketing of two products, 'Ultralon' and 'Ultralon II.'  (Bellani Cert., Ex. A ¶ 9; Ex. D).  In this

agreement, Ultraflex also granted sub-distributor and sub-sub-distributor rights to three other

companies, Unitex, Rainpal, and Designtone for specific geographic areas.  In the ensuing years,

2

with the impetus apparently coming from John Sr., the parties jointly developed a number of

other sign making products such as 'Ultima' and 'Vulite.'  These were also sold by Ultraflex,

although it appears that no written agreement ever covered these products.

In a September 7, 1996 memorandum signed by both parties, Ultraflex and Verseidag

acknowledged that their previous written agreements had expired and they were "in a situation

without a contract" as of October 1, 1996.  (Rowland Cert., Ex. D).  The memorandum also

manifested agreement that the parties wished to maintain a relationship and work toward a

written contract.  The companies continued to do business together.  There were discussions

concerning a new contract and, in the process, a number of letters and proposals were exchanged

between the parties.

On October 20, 1999, the parties signed a Letter of Intent ("LOI") for Verseidag to

purchase Ultraflex.  (Rowland Cert., Ex O).  The LOI provided for a purchase price that could be

adjusted depending on a number of future financial factors.  It also included due diligence and

no-hire provisions.  From the signing of the LOI through June 2000, Verseidag conducted its due

diligence investigation.  On June 27, 2000, however, Verseidag advised Ultraflex that it no

longer intended to complete the acquisition.  Also, in a July 5, 2000 letter, Verseidag notified

Ultraflex that it would no longer provide its internal production schedules as it had done

throughout the relationship.  (Bellani Cert., Ex. V-5).  Ultraflex stopped submitting orders to

Verseidag after September 2000.  By late 2000, Verseidag was setting up its own distribution

network in a number of geographic regions world-wide.  In March 2001, it hired a few of

Ultraflex's key employees, with whom it had been negotiating for some time.  Some of these

employees began to work for Verseidag out of the same offices that Ultraflex had used.

3

This suit challenges aspects of Verseidag's conduct both in connection with the post-1996 distributorship and the LOI.

On March 20, 2003, the Final Pretrial Order in this matter was filed.

## L E G A L   S T A N D A R D

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001). "A 'genuine' issue is one where a reasonable jury, based on the evidence presented, could hold in the movant's favor with regard to that issue." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). When considering a motion for summary judgment, all evidence must be reviewed and all inferences drawn therefrom must be in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252. In order to defeat summary judgment, the non-moving party is required to identify the specific evidence of record which supports the claim and upon which a verdict in its favor may be based, and may not rest upon a vague argument that the record somewhere contains facts sufficient to support its claims. Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988).

Conclusory statements and arguments do not raise triable issues which preclude summary judgment.  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 252 (3d Cir. 1999).  Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson, 477 U.S. at 257 (citation omitted).  If the opponent fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted.  Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986).  In First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968), the Supreme Court stated that while it recognized "the importance of preserving litigants' rights to a trial on their claims," the Court refused "to extend those rights to the point of requiring that anyone who files a [] complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint."

## D I S C U S S I O N

### I. ULTRAFLEX'S CLAIMS

#### A. Claims for Breach of Express Distributorship Agreement (Counts IV, V, and VI)

Verseidag moves for summary judgment seeking the dismissal of Plaintiffs' contract claims.  Count IV asserts a breach of the express distributorship agreement between the parties by refusing to fill orders and selling products directly to Plaintiffs' sub-distributors and customers.  Count V is for improper termination of the distributorship relationship.  Lastly, Count VI asserts a breach of the covenant of good faith and fair dealing.

The first issue for this Court to address is whether the parties even formed a contract.

Verseidag argues there was no contract or agreement between the parties after October 1, 1996.[1]
Rather, they operated on an at-will basis.

Count IV alleges in relevant part that the parties "entered into a specific, enforceable
agreement pursuant to which Ultraflex Systems, for a period of five years from June of 1997, was
designated by Verseidag as the exclusive worldwide distributor of the sign products
manufactured by Verseidag."  (Complaint ¶ 55).

Before moving to the parties' arguments the Court must clarify two issues.  First,
although the Complaint references a June 1997 agreement, as does the Final Pretrial Order
(FPTO Ex. 4 at ¶ 23), Ultraflex apparently has abandoned that allegation.  Instead, it argues that a
March 13, 1997 writing addressed "To Whom It May Concern" ("March letter"), signed by
Messrs. Jenner and Wuttke of Verseidag, is evidence of the exclusive distributorship relationship

---

[1]     According to the September 7, 1996 Memorandum, signed by the parties, there
appear to have been three agreements between them for the marketing of sign fabrics: (1) an
agreement between Verseidag, Ultraflex Systems, Unitex and Designtone for Europe and the
Middle East dated July 1, 1991 (Rowland Cert., Ex. H at Ex. B) which expired; (2) an agreement
between Verseidag, and Ultraflex Systems for the United States and Canada dated April 19, 1989
(Rowland Cert., Ex. H at C; Bellani Cert., Ex. D) which expired; and (3) an agreement between
Verseidag, Ultraflex, Unitex and Rainpal for Asia dated October 1, 1991 (Rowland Cert., Ex. J,
at Ex. 2) which was canceled and expired on October 1, 1996.  (Rowland Cert., Ex. D).
However, according to the Declaration of Reinhold Mühlbeyer, General Manager of Verseidag,
dated January 30, 2001, the July 1, 1991 agreement was terminated November 1995 when
Designtone went Bankrupt, and the October 1, 1991 agreement expired in 1996 without being
renewed.  (Rowland Cert., Ex. J at ¶ 9).  Although Defendant states in its Statement of
Undisputed Material Facts, and in Mr. Mühlbeyer's Declaration, that the October 1 agreement
expired by its own terms in 1996, (Def. Rule 56.1 Stmt. ¶3), it contained a provision at paragraph
17 stating: "If no party gives notice in writing to all other parties to this agreement by October 1,
1996 that they wish this agreement to be terminated, then the agreement will extend for another
five years."  (Rowland Cert., Ex. J at Ex. 2).  It appears that the September 7, 1996
Memorandum, signed by the parties, was the document which "canceled" the October 1
agreement, since it would not have expired at that time by its own terms.  Additionally, the
agreement for the United States and Canada apparently expired in 1995.  (Rowland Cert., Ex. J.
at ¶¶7-8).

between Verseidag, as manufacturer, and Ultraflex, as distributor.  (Plaintiffs' Brief at 7-8).  That

letter states in relevant part:

> It is our intention that Ultraflex Systems should continue to be Verseidag's exclusive
> distributor for the above mentioned fabrics [Ultralon IV, Vulite, Ultramesh, and
> Ultralite].  This means that the above flexible fabrics must be purchased directly from
> Ultraflex Systems Inc. or their authorized agents and distributors with the exception of
> certain countries in Europe. . . .  The above neutralizes all former arrangements for the
> marketing of Verseidag's flexible sign fabrics.

(Bellani Cert., Ex. E).  Nowhere in the Complaint or the Final Pretrial Order is there an assertion

that the agreement at issue is this March 13 letter.  Indeed, Plaintiffs' own "Contested Facts"

section in the Final Pretrial Order states:

> 23.  Over the months which ensued, Ultraflex and Verseidag endeavored to
> formalize and memorialize the terms of their relationship on a "going forward"
> basis.  In June of 1997, the terms of the Agreement between Ultraflex and
> Verseidag were memorialized in an exchange of correspondence between
> Ultraflex and Verseidag, dated June 18, 1997 and June 19, 1997.  Essentially, the
> substantive terms of the Agreement between the parties included that:
> > A.    Ultraflex Systems would be the exclusive worldwide
> >        distributor of the products known as Ultralon IV, Vulite,
> >        Ultramesh, Ultralite, New Vulite T 500 and Ultima.
> > B.    All fabrics were to be sold by Ultraflex Systems or its
> >        authorized agents and distributors.
> > C.    Verseidag did not have the right to use the aforementioned
> >        trade names without the authorized consent of Ultraflex
> >        Systems.
> > D.    The agreement would be valid for a period of five years.

(FPTO Ex. 4 at ¶ 23; Bellani Cert. Ex. GGG at ¶ 23).  Further, Plaintiffs' Counter-statement No.

5 to Defendant's Rule 56.1 Statement claims that the March 13, 1997 letter, among other things,

merely re-affirmed the parties' manufacturer-exclusive distributor relationship.  Plaintiffs state:

"The evidence before the Court demonstrates that the parties intended to, and did, continue the

manufacturer-distributor relationship after 1996 despite the absence of a new formal written

agreement signed by both parties."  (Pl. Counter-statement No. 4).

Given Plaintiffs newly identified reliance on the March 13 letter as being the exclusive

distributorship agreement between the parties, and the lack of deposition testimony presented to

the Court supporting this claim, the Court can only conclude that Defendant would be prejudiced

by permitting this late maneuver.  The Final Pretrial Order expressly states "Proofs shall be

limited at trial to the contested facts set forth.  Failure to set forth any contested fact shall be

deemed a waiver thereof."  (FPTO Ex. 4 at p. 1).  Since there is no claim in the Complaint or the

Final Pretrial Order that the March 13 letter constituted the exclusive distributorship agreement

between the parties, Plaintiffs are estopped from raising it at this late stage and have waived any

such argument.[2]  See, e.g., Coleco Industries v. Berman, 567 F.2d 569 (3d Cir. 1977) (evidence

of accounting study not disclosed to opposing party in pretrial properly excluded); Jakelsky v.

Friehling, 33 F. Supp. 2d 359, 368 (D.N.J. 1999) (noting absence of factual allegation relevant to

summary judgment motion).  Having been presented with Plaintiffs' concession in their brief,

that aside from the March 13, 1997 letter "it is true that there is no other writing subsequently

signed by Verseidag which purports to be an agreement," Plaintiffs' previous claim that a June

1997 Agreement conclusively established their distributorship relationship is now moot.

However, even if there were a distributorship agreement, the Court agrees with

Verseidag's argument that it was entitled as a matter of law to cancel that agreement without

reasonable notice because Ultraflex was seriously delinquent on payments owed to Verseidag.

---

[2]While there has been ample time for Plaintiffs to move to amend their Amended
Complaint and to amend the Final Pretrial Order, to identify the agreement upon which they
planned to rely at trial, no such motion has been made.  Plaintiffs did, however, make a motion to
amend the Final Pretrial Order to add witnesses and documents, which was granted in part and
denied in part. [CM/ECF Docket Entry # 83].

N.J.S.A. 12A:2-703(f); Gilette Foods, Inc. v. Bayernwald-Fruchterverwertung, GmbH, 1991 U.S. Dist. LEXIS 2077, at *44-50 (D.N.J. Feb. 12, 1991); L&M Enters, Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1288 (10th Cir. 2000).

In New Jersey, unless a contract states otherwise, a sales contract may be terminated by either party at any time "[w]here the contract provides for successive performances but is indefinite in duration." N.J.S.A. § 12A:2-309(2). However, unless the contract provides that it terminates automatically on the happening of an agreed upon event, the terminating party must provide reasonable notification of termination to the other party. N.J.S.A. § 12A:2-309(3); see also Jo-Ann, Inc. v. Alfin Fragrances, Inc., 731 F. Supp. 149 (D.N.J. 1989) (termination of distributorship not reasonable where alleged notice of termination and termination occurred simultaneously); Ideal Dairy Farms v. John Labatt, Ltd., 90 F.3d 737, 751 (3d Cir. 1996) (Scirica, J., dissenting).

While a termination under § 2-309 (2)-(3) requires reasonable notice, a cancellation under § 2-703(f) does not. Cancellation is one of the remedies available to a seller under § 2-703, which provides in pertinent part that whenever "the buyer . . . fails to make a payment due . . . or repudiates [the contract] . . . the aggrieved seller may . . . cancel." N.J.S.A. § 12A:2-703. As N.J.S.A. § 12A:2-106(4) explains: "'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance." See also Gilette Foods, Inc. v. Bayernwald-Fruchterverwertung, GmbH, 1991 U.S. Dist. LEXIS 2077, at *47-50 (D.N.J. Feb. 12, 1991).

The record clearly shows that since 1995 Ultraflex was in continuous debt to Verseidag

9

as a result of shipments that it did not pay for promptly.  Ultraflex had, at times, a credit ceiling

of three million Deutsche Marks and Ultraflex consistently maintained debt near that limit.  The

evidence shows that Verseidag constantly complained to Ultraflex about the high debt levels.

(Rowland Cert. Ex. C at 341-400; Ex. I).  On many occasions Verseidag refused to ship an order

because doing so would put Ultraflex over its credit limit.  (See, e.g., Rowland Cert. Ex. I at

VERS-000900).  Ultraflex does not dispute this state of affairs, although it claims the

delinquencies were not serious because it always stayed below its credit limit.[3]  Ultraflex's

principal response is that in June 2000 Ultraflex's balance was at a very low point in comparison

to its usual level during the relationship, it was being paid down quickly, and was below the three

million Deutsche Mark cap.  Finally, it claims that much less was due than Verseidag claimed

because Ultraflex had claims for commissions and defects in materials.

_____Verseidag disputes Ultraflex's claim that it had a so-called credit line, and Ultraflex fails

to set forth competent evidence establishing that it did have a credit line.  The sole evidence

Ultraflex relies on in its Counter-statement No. 19 does not show anything more than that there

was a ceiling on the credit which Ultraflex was not permitted to exceed with its orders.  The

documents do not establish that Ultraflex had a revolving line of credit as Ultraflex contends.

(See, e.g., Bellani Cert., Ex. UUU, Mühlbeyer Dep. at 55:22).  As Mr. Mühlbeyer stated in his

deposition, "The payment terms was 60-day net."  (Id. at 55:22; 59:14-17; see also Bellani Cert.,

Ex. VVV, Jung Dep. at 67:24-25).  Moreover, many of the invoices submitted to the Court

reflect that under the section labeled "TERMS OF DELIVERY AND PAYMENT" the invoices

---

[3]It is Ultraflex's contention that it had a credit line with Verseidag comparable to a
revolving line of credit.

stated "60 DAYS FROM DATE OF INVOICE NET."  (Rowland Suppl. Cert. Ex. I).  There is also a significant amount of correspondence between Verseidag and Ultraflex dating back to the mid-1990's in which Verseidag repeatedly asked Ultraflex to pay its bills.  (Bellani Cert. Ex. Y; Rowland Cert. Ex. I).  For example, a memo dated May 24, 1995 states: "Our financial department blocked again your account, . . . and we demand for immediate payment."  (Rowland Cert., Ex. I, VERS-000706).  Another memo dated July 15, 1996 states in relevant part:

> Today your account with us was blocked again due to an overdue amount . . . . We are not allowed to ship any of your orders until we received a payment covering the amount of the overdue invoices. . . ."

(Rowland Cert., Ex. I, VERS-000739).  On January 26, 1998, a bill was sent to Ultraflex stating:

> WE ARE VERY SORRY HAVING TO FIND OUT THAT YOU DID NOT REACT TO OUR TWO PREVIOUS REMINDERS.  PLEASE SEE THE OVERDUE IN THE COLUMN "OVERDUE".  YOUR ACCOUNT HAS BEEN BLOCKED FOR FURTHER DELIVERIES AGAINST OPEN TERMS.
> WE, THEREFORE, ASK YOU TO SETTLE ALL OVERDUE INVOICES BY 02.02.1998
> OTHERWISE, WE WILL BE FORCED TO TAKE LEGAL STEPS.

(Rowland Cert., Ex. I, VERS-000764).  These are only a few of the memos submitted to the Court.

In addition, there are also documents reflecting that on at least two occasions Verseidag explained to Ultraflex that it was not a bank.  On July 9, 1999, Verseidag wrote:

> our payment requirements most obviously vanish in the haze.  Some single payments do not help reducing the balance while proceeding with shipments.  Its like filling one hole while creating another. . . . There is no bank in the world giving credit to anybody for more than DM 3 million without any guarantee. After all, we are not such institution either.

(Rowland Cert., Ex. I, VERS-000860).  Also, handwritten on a memo dated February 24, 2000 is the following:

<u>Dear John</u>
Our intention was to have not more than 3 Million as an outstanding amount in general.  But we don't want to be the bank of Ultraflex.  The <u>overdue</u> amounts should be paid.
Reinhold Muehlbeyer

(Bellani Cert., Ex. Y-6) (emphasis in original); (<u>see also</u> Bellani Cert., Ex. UUU, Mühlbeyer Dep. at 61:14-18).

Also noteworthy is the deposition testimony of Renee Ann Donelson, the Controller of Ultraflex, on July 9, 2002, in which she explained the process in which Ultraflex itself extended credit to its customers.  (Bellani Cert. Ex. PPP, Donelson Dep.).  Ms. Donelson stated that in setting up a credit line, most customers are net 30, net 45, or net 60.  (<u>Id.</u> at 110:22-25).  She "like[s] to keep most people no more than 30 days to 60 days outside their credit. . . ."  (<u>Id.</u> at 111:2-3).  If a customer does not pay their invoices as agreed then she "may put them on COD plus $1,000 a week."  (<u>Id.</u> at 111:15-16).  The purpose of the credit limit "is to give [her] a general idea of what [she] can and cannot allow the customer to be exposed for."  (<u>Id.</u> at 115:14-18).  Thus, the manner in which Ultraflex extends credit is really no different from the manner used by Verseidag.

Since Ultraflex has failed to identify specific evidence of record to support its claim that it had an agreement that was terminated without notice or that it had a revolving line of credit which did not have to paid, this Court finds that, assuming there was an agreement, Verseidag, at the most, cancelled the agreement by discontinuing its shipments for nonpayment of invoices. This Court is not convinced that there is anything more than "some metaphysical doubt as to the material facts."  <u>Matsushita</u>, 475 U.S. at 586.  That said, the Court is not entirely convinced that there was even a cancellation when Verseidag refused to ship orders, as it had on many other

occasions, because the parties do not dispute that "Ultraflex altogether stopped submitting orders to Verseidag after September 2000."  (FPTO, Ex. 3 at ¶ 2).

Lastly, Ultraflex complains it was a breach of the covenant of good faith and fair dealing when Verseidag terminated without reasonable notice because it invested substantial amounts in reliance on its exclusive distributorship with Verseidag.  "A covenant of good faith and fair dealing is implied in every contract in New Jersey."  Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001) (citing Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997), cert. denied, 454 U.S. 1054 (1981).  The New Jersey Uniform Commercial Code ("UCC") provides that "every contract . . . imposes an obligation of good faith in its performance or enforcement."  N.J.S.A. 12A:1-203.

Verseidag argues that there can not be a breach of this covenant without an express enforceable contract.  Given this Court's foregoing analysis, there was no breach of the covenant of good faith and fair dealing because there was not a contract, and even if there was the cancellation of it was not improper.  Therefore, Verseidag's motion for summary judgment on Counts IV, V and VI is granted.

### B.  Tortious Interference with Existing Business Relationships and Prospective Economic Benefits (Counts I and II)

Counts I and II of Plaintiffs' Complaint assert claims for tortious interference with existing business relationships and tortious interference with prospective economic benefits. To make a successful claim for tortious interference, a plaintiff must demonstrate:

> (1) the existence of a protectable economic or contractual right; (2) malicious intent to interfere with such relations; (3) that the defendant's interference caused the loss of prospective gain; (4) that such a loss was the proximate cause of injuries.

13

Braunstein v. Benjamin Berman, Inc., Civil Action No. 89-5344, 1990 U.S. Dist. LEXIS 20922 at *72 (D.N.J. Sept. 14, 1990) (citing Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989)). New Jersey has adopted the definition of tortious interference with an existing contract from Section 766 of the Restatement (Second) of Torts, Matrix Essentials, Inc. v. Cosmetic Gallery, Inc., 870 F. Supp. 1237, 1247 (D.N.J. 1994), aff'd, 85 F.3d 612 (3d Cir. 1996), which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979).

Ultraflex predicates its tortious interference claims in Counts I and II on allegations that, by refusing to ship product to Ultraflex and Ultraflex customers, Verseidag prevented Ultraflex from fulfilling its contracts with it customers and sub-distributors. As a result, Ultraflex lost both the benefits of the current business and the future benefits it would have realized from its investment in building these relationships. It is now undisputed that Ultraflex did not have any written contracts with its customers and sub-distributors, but Ultraflex argues that it did have "both existing and prospective relationships with them and had reasonable expectations of economic benefits flowing therefrom based upon the fact that it was uniquely positioned to take advantage of their presence in these developing and burgeoning markets virtually to the exclusion of all competitors." (Pl. Br. at 17). Ultraflex's brief in opposition to Verseidag's motion sets forth circumstantial evidence to support their claim that Verseidag intended to put Ultraflex out of business and to replace Ultraflex. Nevertheless, Ultraflex's focus remains on its argument that

Verseidag employed unfair tactics in discontinuing shipments of product.

Verseidag argues that Ultraflex has not presented any evidence on the element of malice, thus failing to come forward with evidence showing Verseidag intended to wrongfully interfere with its business relationships.  In addition, even if Ultraflex's claim that Verseidag intended to do business with Ultraflex's customers, it shows nothing more than that Verseidag was competing for the business of Ultraflex's customers.  Verseidag also contends that the tortious interference claim is derivative of the breach of contract claim, and therefore cannot be a basis for a separate claim.  Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 316 (2002).

These counts fail because Ultraflex has failed to  present concrete evidence that Verseidag intentionally and maliciously interfered with a "protectable right," and that Verseidag's interference caused injury. Printing Mart, 563 A.2d at 37.  Malice is "harm inflicted intentionally and without justification or excuse, transgressing the bounds of fair play." Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc., 282 N.J. Super. 140, 199-202 (App. Div. 1995).  A showing of normal competition and the desire to profit is not sufficient to rise to the level of malice.  Id. at 199.

While it is arguable that Ultraflex has shown it possessed existing and prospective business relationships, the allegations made by Ultraflex fail to reach the necessary level of maliciousness.  As already explained, the Court has determined that no contract existed and the parties were operating on an at-will basis.  Therefore, Verseidag could discontinue shipments at any time.  In addition, even if there was a contract, Verseidag had independent business justifications or excuses to discontinue shipping further product to Ultraflex in light of Ultraflex's

serious payment delinquencies.[4]  But for the discontinuance of the products' shipments, Ultraflex would not have suffered injury.

In conclusion, because Ultraflex cannot present evidence raising a question of material fact to rebut Verseidag's showing that it had a justification or excuse for its actions in discontinuing shipments, Ultraflex cannot make out a prima facie case for tortious interference with prospective economic advantage.  See, e.g., Coast to Coast Entm't, LLC v. Coastal Amusements, Inc., 2005 U.S. Dist. LEXIS 26849, at *71-72 (D.N.J. Nov. 7, 2005) (finding that since there were business justifications for terminating plaintiff as a distributor, there was no demonstration of malice).  Thus, Verseidag's motion for summary judgment as to Counts I and II is granted and these claims are dismissed.

## C.  Unfair Business Practices (Count III)

_____Verseidag also seeks summary judgment on Count III alleging a claim of unfair business practices.  As noted at the preliminary injunction hearing by former Chief Judge Bissell, "unfair business practices" is not a cause of action in New Jersey.  (Rowland Cert. Ex. A at 4).  He surmised that Ultraflex may have meant to plead the recognized cause of unfair competition.[5]  Ultraflex did not alter this count in its Complaint, and it did not respond in its opposing brief to Verseidag's arguments on this count.  "[C]ourts both within and beyond the Third Circuit

---

[4]Also, assuming the existence of a contract, the obligation to ship products would arise out of the parties' contractual relationship.  Since an action sounding in tort "does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law," Plaintiffs' tortious interference would also fail.  Saltiel, 170 N.J. at 316.

[5]"New Jersey recognizes an action for unfair competition where one passes off his or her goods or services as those of another."  SK&F, Co. v. Premo Pharmaceutical Labs., Inc., 625 F.2d 1055, 1062 (3d Cir. 1980); see FM 103.1, Inc. v. Universal Broad., 929 F. Supp. 187, 199 (D.N.J. 1996).

routinely have held the claim at issue to have been abandoned" when it "is not defended in [its]

opposition to defendant's motion."  <u>Evans v. Nine West Group, Inc.</u>, 2002 WL 550477, at *4

(E.D. Pa. April 15, 2002); <u>see also</u> <u>Damiano v. Sony Music Entm't, Inc.</u>, 975 F. Supp. 623, 627

(D.N.J. 1996) (granting summary judgment on the basis that motion considered unopposed); <u>U.S.</u>

<u>v. Rohm & Haas Co.</u>, 939 F. Supp. 1157, 1161 (D.N.J. 1996) (granting summary judgment on

basis that plaintiff's argument was unopposed, and thus no genuine issue of material fact was

created).  As such, the Court finds summary judgment appropriate for Verseidag on Count III of

the Complaint.

### D.  <u>Fraud (VII)</u>

Count VII of Plaintiffs' Complaint asserts a claim for fraud.  Ultraflex's fraud count

alleges that Verseidag signed the Letter of Intent ("LOI"), on October 20, 1999, for Verseidag to

purchase Ultraflex, while secretly intending not to acquire Ultraflex.  The LOI was allegedly part

of a plan to lull Ultraflex "into acquiescing to Verseidag's failure to ship product to their

customers with standing orders and to Verseidag's refusal to replenish Ultraflex Systems'

warehouse inventory."  (Complaint ¶ 73).  The Complaint further states that the "actions of

Verseidag reflect a carefully orchestrated plan to weaken the Ultraflex Companies, then cripple

them, and finally to eliminate them as a presence in the market for sign face materials."

(Complaint ¶ 76).

"To prevail on a claim of common law fraud, plaintiffs must prove: (1) a material

representation of a past or present fact, (2) knowledge by the defendant of its falsity, (3) intention

that it be relied upon, (4) their own reasonable reliance upon it, with (5) resulting damages."

<u>Silverman v. Ernst & Young, LLP</u>, 1999 U.S. Dist. LEXIS 17703, at *30-31 (D.N.J. Aug. 3,

1999) (citing <u>Gross v. Johnson & Johnson-Merck Consumer Pharm. Co.</u>, 696 A.2d 793, 796 (N.J. Sup. Ct. App. Div. 1997)).

In moving for summary judgment on this claim, Verseidag first contends that Ultraflex has failed to identify any misrepresentation made to it by Verseidag. The sole allegation, Verseidag argues, is that Verseidag concealed its intent not to acquire Ultraflex, which is not a misrepresentation. While contending that Verseidag misrepresented its intention to acquire Ultraflex, as evidenced by its entering into the LOI, Ultraflex argues that fraud can also be found in the absence of an affirmative misrepresentation when there is a duty to disclose. <u>See Bonnco Petrol, Inc. v. Epstein</u>, 115 N.J. 599, 610 (1989) ("Silence in the face of an obligation to disclose amounts to equitable fraud."); <u>Berman v. Gurwicz</u>, 178 N.J. Super. 611, 619 (Ch. Div. 1981) ("Silence in the face of an obligation to speak may be fraud."). However, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1185 (3d Cir. 1993).

First, if Ultraflex is asserting fraud based upon a misrepresentation, no reasonable jury could conclude that, given its non-binding nature, the LOI itself amounted to a fraudulent misrepresentation. The LOI, however, was not a binding contract and was not a representation that could reasonably be relied upon since it provided that "[n]either Purchaser not Seller will be obligated to consummate the acquisition unless and until the parties have reached a definitive agreement as to all of the essential terms of the acquisition. . . . [and] [e]ither party may terminate this letter in writing at any time and for any reason." (Rowland Cert., Ex. O at 4-5). Also, it is undisputed that Ultraflex has not identified any other statement by Verseidag that induced

Ultraflex to enter into the LOI, thus Ultraflex is solely arguing that the LOI is the misrepresentation that forms the basis of its fraud claim.

Second, Ultraflex fails to establish that Verseidag committed fraud by suppressing that it did not intend to acquire Ultraflex when it entered into the LOI. Even if Verseidag entered into the LOI with the express intention not to consummate an acquisition of Ultraflex, Ultraflex's claim still fails. Ultraflex fails to establish how Verseidag had a duty to disclose in this instance. As previously stated, there is no duty to disclose unless the party needs to correct a previous statement or where there is a special relationship between the parties. In Lightning Lube, the Third Circuit identified three types of relationships that would give rise to a duty to disclose:

> (1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties.

4 F.3d at 1185. Here, the relationship created by the LOI between the parties is that of a buyer and a seller. None of these three types of relationships are at issue. Therefore, there is no duty to disclose.[6]

There is the further problem that Ultraflex's claim regarding Verseidag's alleged scheme to eliminate Ultraflex from the sign face materials business is not supported by evidence that when the LOI was signed that Verseidag never intended to buy Ultraflex. To show that Verseidag signed the LOI while harboring a secret intent not to acquire it, Ultraflex garners an array of circumstantial evidence: (1) a July 1999 Verseidag writing that contemplated the possibility of

---

[6]Of note is that Ultraflex did not even identify what would establish a duty to disclose in the present situation.

hiring Ultraflex employee Garland Drew (Bellani Cert. Ex. TT at VERS-000567); (2) on June 14,

2000, about thirteen days prior to terminating the LOI, Verseidag attempted to register some trade

names that it believed Ultraflex owned (Bellani Cert. Ex. X-2, X-3, X-4); (3) Verseidag failed to

make deliveries to Ultraflex or direct shipments in the months preceding the planned acquisition,

frustrating Ultraflex's customers, which a company actually intending an acquisition would not do

(Bellani Cert. Ex. B ¶ 10, 13, 14); (4) instead of applying the LOI's formula for reducing purchase

price when Verseidag believed the profits to be less than expected, it terminated the agreement

saying it was dissatisfied with Ultraflex's "maintainable profits," a term not discussed in the LOI

(Bellani Cert. Ex. VVV); (5) in a July 1999 memorandum, Reinhold Mühlbeyer advised

Verseidag not to buy Ultraflex at a price above 10.8 million DM, but the October 1999 LOI

contemplated a larger purchase price of 25.2 million DM (Bellani Cert. Ex. TT at VERS-000570).

Verseidag argues that many of these documents simply show internal evaluations of

business alternatives carried out by any responsible company.  It cites Alexander v. CIGNA, 991

F. Supp. 427 (D.N.J. 1998), to show that evidence from internal business documents concerning

evaluation of business alternatives is inadequate as a matter of law to show a secret intent to

commit fraud.

Reviewing the five pieces of evidence upon which Ultraflex relies, the Court notes that

only items (1) and (5) predate the signing of the LOI.  Thus, to the extent that Ultraflex attempts

to argue that Verseidag fraudulently induced Ultraflex to enter into the LOI when it had no

intention of acquiring Ultraflex, items (1) and (5) are the only relevant evidence.  The fact that

Verseidag may have later decided to attempt to register some of Ultraflex's trade names, that

Verseidag discontinued shipping product for non-payment, or that Verseidag later determined that

it was dissatisfied with Ultraflex's "maintainable profits" does not demonstrate that a fraud was perpetrated by the signing of the LOI.[7]

As for the evidence that does predate the signing of the LOI, both are contained within the same July 1999 Memorandum titled "Discussion Basis for the Strategic Direction of the Product Group Duraprint." (Bellani Cert. Ex. TT). As its title implies, the memorandum involves a discussion by Verseidag of the strategic direction of a product, in a market primarily dominated by Ultraflex. A reading of the memorandum reveals that it was an internal document contemplating the strategic possibilities of either developing its own distribution network or acquiring Ultraflex. The Court will address each piece of Ultraflex's evidence, items (1) and (5), in turn.

The first piece of evidence that Ultraflex mentions in support of its fraud claim involves this July 1999 memorandum in which it indicates Verseidag contemplated the possibility of hiring

---

[7]In any event, these three pieces of evidence, even taken as a whole, fail to demonstrate a secret intent. As explained previously, Verseidag's failure to make deliveries to Ultraflex or direct shipments to Ultraflex customers in the months preceding the termination of the acquisition, was a justifiable business decision in light of the high level of outstanding debt which Ultraflex was not repaying despite repeated notices. Plaintiffs' argument that a company actually intending an acquisition would not discontinue shipments is unavailing particularly in light of the fact that the LOI was non-binding and Verseidag was entitled to not follow through with the acquisition.

The final two pieces of evidence took place around the time Ultraflex was informed that Verseidag terminated discussions about an acquisition on June 27, 2000. For example, on June 14, 2000, about thirteen days prior to terminating the LOI, Verseidag attempted to register some trade names that Ultraflex owned. This may show that shortly before terminating discussions Verseidag knew it was not going to acquire Ultraflex, but it does not amount to fraud as pled in this Complaint.

Lastly, instead of applying the LOI's formula for reducing purchase price when Verseidag believed the profits to be less than expected, it terminated the agreement saying it was dissatisfied with Ultraflex's "maintainable profits." Ultraflex contends this also demonstrates fraudulent intent because "maintainable profits" was not a term discussed in the LOI. Again, this does not demonstrate fraudulent intent. Verseidag was not constrained by the LOI to complete the acquisition and could have given any or no reason for not concluding the acquisition.

Ultraflex employee Garland Drew to aid Verseidag in developing its own distribution network in the United States of America.  (Bellani Cert. Ex. TT at VERS-000567).  It specifically states:

> The greatest gap exists in South and North America.  In my opinion it is therefore
> necessary and imperative, to establish a distribution company in the USA.  Garland
> Drew could possibly be won over for this purpose, who, due to his experience,
> would be able to set up this business in the short term.  In addition he can quickly acquire more employees

(Id.).

The fifth item of evidence involves the same July 1999 memorandum, in which Reinhold Mühlbeyer advised Verseidag not to buy Ultraflex at a price above 10.8 million DM, even though the October 1999 LOI contemplated a larger purchase price of 25.2 million DM.  (Bellani Cert. Ex. TT at VERS-000570).  The exact context of that statement occurred in a section titled "Comparison of the Alternatives" in which it was considered "under which conditions an acquisition of Ultraflex would correspond to the development of our own distribution in terms of the results."  (Id.).  The analysis went on as follows:

> For this purpose, the cash value of the profits (pre-tax) of the next 5 years was
> taken into consideration at an interest rate of 5% for the development of our own
> distribution.  The purchase price for Ultraflex was then directed in such a manner
> that the cash value of the profits in the next 5 years corresponds approximately to
> the cash value determined above when buying Ultraflex.  It shows that this would
> be the case with a purchase price of DM 10.8 million, and with that, both
> alternatives are equal at least in the numbers.

(Id.).  The memorandum even went on to identify additional issues that needed to be taken into consideration before a final decision was reached.  (Id.).

Viewing the evidence in a light most favorable to the non-moving party, these internal documents do not, as Plaintiffs contend, evidence a secret intent on the part of Verseidag to conceal a plan not to acquire Ultraflex.  Verseidag was merely evaluating business alternatives

and it is of no moment that Verseidag decided to more than double its offering price in the LOI. As for the possibility of hiring Garland Drew, it was merely a contemplation as to how they would be able to develop a market in the United States if they did not acquire Ultraflex. Ultraflex has not set forth probative evidence supporting its claim of fraud to raise a triable issue. Therefore, summary judgment is granted on the fraud claim.

### E.  Unjust Enrichment (VIII)

Count VIII of the Complaint alleges that:

> Verseidag, in effect, has stolen the Ultraflex Companies' complete customer list, it has solicited business from the Ultraflex Companies' sub-distributors and customers, it has been using the names for its products which the Ultraflex Companies used and with respect to which the Ultraflex Companies have protected trademark rights, it has induced key Ultraflex Company employees to resign from the Ultraflex Companies and to work for Verseidag and it has begun to position itself as the replacement of the Ultraflex Companies in this industry's market.

(Complaint ¶ 82). As such, Verseidag was unjustly enriched because it received a benefit from Ultraflex for which it did not pay Ultraflex. These are essentially the same arguments raised in Ultraflex's brief and Verseidag challenges this as a "kitchen sink" argument.

Unjust enrichment is an equitable remedy, requiring for recovery that there be both an enrichment, and an injustice resulting if recovery for the enrichment is denied. See VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." Id. Further, unjust enrichment may describe a recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay. 66 Am. Jur. 2d

Restitution and Implied Contracts § 9 (2004).

Each of the allegations set forth in this count is also set forth elsewhere in the Complaint as a separate cause of action.  Moreover, here they are alleged as torts.  The Restatement of Torts does not recognize unjust enrichment as an independent tort cause of action.  Castro v. NYT TV, 370 N.J. Super. 282, 299 (App. Div. 2004).  Ultraflex has not alleged that it performed or otherwise conferred a benefit on Verseidag under a contractual or quasi-contractual relationship with the expectation of remuneration.  Rather, Ultraflex asserts a variety of tort claims that may have the underpinnings of contract claims, and for which Ultraflex clearly did not anticipate or expect remuneration.  Assuming the facts alleged in the Complaint are true, Ultraflex could not have anticipated, let alone expected remuneration, for Verseidag stealing its customers and employees and systematically putting it out of business.  Therefore, Ultraflex has not stated a claim upon which relief can be granted for unjust enrichment under New Jersey law.

### F.  **Trademark Infringement (IX)**

Count IX of Ultraflex's Complaint asserts a claim for trademark infringement.  Ultraflex claims it has "acquired, either through prior usage and/or registration of various trademarks for the products manufactured by Verseidag, legally protected rights in . . . . products known as Ultralon, Ultralon II, Ultralon IV, Vulite, Ultramesh, Ultramesh Supreme, Ultralite, New Vulite T 500, Vulite Supreme, Ultima and Ultima Supreme."  (Compl. at ¶¶ 86-87).  In violation of these legal rights, Verseidag has allegedly marketed products under these names without license or permission from Ultraflex.  (Compl. at ¶ 88).

Ultraflex has not set forth whether it is proceeding under federal trademark law or common law, thus the Court will discuss both.  Under common law, legal ownership of a

trademark "is determined by examining whether a party had both actual use and first use of the mark." Gen. Bus. Servs., Inc. v. Rouse, 495 F. Supp. 526, 533 (E.D. Pa. 1980).  Under federal trademark law, success on a trademark claim requires confirmation that (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) defendants' use of the mark to identify goods or services is likely to create confusion about the origin of the goods or services.  See Ford Motor Co. v. Summit Motor Prods. Inc., 930 F.2d 277, 291 (3d Cir.), cert. denied, 112 S. Ct. 373 (1991) (citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990)).  The first two requirements, validity and legal protectability, are proven where a mark was federally registered and has become "'incontestable' under the Lanham Act, 15 U.S.C. §§ 1058 and 1065."  Fisons Horticulture Inc. v. Vigoro Indus. Inc., 30 F.3d 466, 472 (3d Cir. 1994).

Under either federal or common law, it is essential that the Plaintiffs establish legal ownership of the mark in dispute.  Without any citation to evidence in the record, Ultraflex contends "On March 13, 1997, Verseidag expressed its clear and unequivocal understanding that the trade names 'Ultralon IV,' 'Vulite,' 'Ultramesh' and 'Ultralite' belonged to Ultraflex."  (Pl. Opp. Br. at 33).  Having scoured Ultraflex's numerous exhibits, the Court uncovered a memorandum with that date and that mentions those trade names.  However, contrary to Ultraflex's claim, the memorandum states: "Let it be known that since 1986, Ultraflex Systems, Inc. have been the exclusive world-wide marketing and distribution company for Verseidag Indutex's flexible sign and bill board fabrics, trademarked under Ultralon IV, Vulite, Ultramesh and Ultralite."  (Bellani Cert. Ex. E).  The Court's impression of this statement leads it to believe that Verseidag possessed the trademarks.  Nevertheless, it does not appear that Verseidag makes such a claim and this statement does support Verseidag's assertion that "For many years, Ultraflex

25

and Verseidag both used, with each other's knowledge and consent, certain trademarks that identified the goods manufactured by Verseidag and marketed by Ultraflex, Verseidag, and others." (Defendant's Revised Rule 56.1 Statement at ¶80).

Ultraflex also contends that Section 3.19 of the proposed Stock Purchase Agreement and Section 3.08 of the Asset Purchase Agreement, between the instant parties, demonstrates Verseidag's intent to purchase these trade names from Ultraflex. (Bellani Cert. Exs. O and R). These exhibits, while referencing trademarks and trade names owned by Ultraflex, as set forth in Schedule 3.19, the agreement does not detail the trademarks and trade names, nor does Schedule 3.19. That Schedule, obviously in draft form, is notably blank. Thus, it is unclear to the Court what trademarks or trade names are contemplated by these agreements.

There are, however, sufficient questions of material fact present in this case to prevent this Court from determining this issue on a motion for summary judgment. The Court cannot ascertain which entity is the legal owner of these trademarks or trade names, under federal trademark law or common law.

Even if it is conclusively established that Ultraflex is and was the owner of these trade names, the Court still cannot grant summary judgment to Verseidag because it appears Verseidag did use Ultraflex's trade names without permission. Ultraflex alleges that Verseidag sold materials using those trade names without Ultraflex's written permission both during their business relationship and after termination of the LOI on June 27, 2000 and November 26, 2000. Verseidag also used these names on its website until September 27, 2000 and used them in a press release on December 5, 2000. (Bellani Cert. Ex. EEE-1; Bellani Cert. Ex. EEE-2).

Verseidag first points out that during the time of their business relationship, it used the

26

trademarks with Ultraflex's knowledge and consent.  In support, it points to instances in which

Verseidag made direct sales using the trade names with Ultraflex's knowledge and consent.

(Rowland Cert. Ex. C at 500; Rowland Supp. Cert. Ex. D at 55-56).  The first time that Ultraflex

attempted to prevent Verseidag from using the trade names was allegedly in September of 2000.

Recounting this meeting in a November 21, 2000 letter, John E. Schleicher, Jr. ("John Jr."),

shareholder and vice president of Ultraflex Systems, Inc., stated:  "As I walked out the door it was

stated that Verseidag did not have the rights to use our trade marked names."  (Rowland Supp.

Cert. Ex. A).  Verseidag alleges that within weeks of this meeting, it stopped using the trade

names, and registered its own trade names on November 21, 2000.  (Bellani Cert. Ex. X).

Verseidag argues that Ultraflex must show unauthorized use, but that the facts show Verseidag

had implied authorization from Ultraflex's objective conduct until September 2000.  Birthright v.

Birthright, Inc., 827 F. Supp. 1114 (D.N.J. 1993) (implied authorization can be shown by

objective conduct).  Without citation to any case law, Verseidag claims that it cannot be held

liable for a very brief period of use after the time of Ultraflex's demand.

Under these circumstances, it appears that Verseidag did use Ultraflex's trade names for at

least a brief period of time in 2000.  Therefore, genuine disputes of material fact exist that defeat

summary judgment.

Lastly, Verseidag argues that Ultraflex has not shown a basis for damages and, as such, the

claim should be dismissed.  Ultraflex makes the assertion that there were damages, but fails to

provide any support or explanation.  It does say that it is entitled to attorney's fees on this count

because the "acts . . . have been willful and calculated to trade upon [Ultraflex's] good will."  Red

Devil Tools v. Tip Top Brush Co., 50 N.J. 563, 574 (1967).

Under the Lanham Act, a prevailing plaintiff that establishes infringement of its registered mark is entitled, subject to the principles of equity, "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117.  Therefore, even if Ultraflex cannot show a basis for damages, it may be entitled to Defendant's profits and costs of the action.  Accordingly, summary judgment is denied on the trademark infringement claim.

### G.  Breach of Letter of Intent - No-Raid/No-Hire Provision (X)

Verseidag next moves for summary judgment on Count X of Ultraflex's Complaint.  That count alleges that Verseidag breached Paragraph 6 of the LOI, providing that Verseidag "will not hire the employees of Ultra-Flex set forth in the Schedule C hereto" "[u]ntil the first anniversary of the termination of this letter of intent."  (Rowland Cert., Ex. O).  It is undisputed that the LOI was formally extended to terminate on February 29, 2000 (originally it was scheduled to terminate on December 31, 1999), and that no other written extension was made.  (See Plaintiffs' Brief at 26; Defendant's Moving Brief at 21; Counterstatement ¶ 76).  It is also undisputed that no Schedule C was ever attached to the LOI.  (Counterstatement ¶ 77).  Finally, the parties agree that although Verseidag solicited a number of Ultraflex employees, it did not actually hire any before February 29, 2001.  (Counterstatement ¶ 78).  Thus, the only issue is the correct interpretation of the contractual provision.

Ultraflex faces two interrelated hurdles to establishing that the LOI no-hire clause prohibited Verseidag's conduct.  First, the provision must cover some of Ultraflex's employees.  Second, either the word 'hire' must include soliciting, or if it does not, the time period covered by the provision must extend past February, 29, 2001.  The Court finds that it need not address the

28

latter issue because the former is dispositive.

It is black letter law that the parol evidence rule operates to exclude testimony "when it is offered for the purpose of 'varying or contradicting' the terms of an 'integrated' contract." Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, 302 (1953); see also Genesis Bio Pharmaceuticals, Inc. v. Chiron Corp., 2002 WL 27261, at *4 (3d Cir. Jan. 10, 2002).[8]  The parol evidence rule does not bar all extrinsic evidence under New Jersey law.  In interpreting the meaning of a contract, "[t]he polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded."  Schwimmer, 12 N.J. at 301.  Nevertheless, extrinsic evidence that contradicts the express written terms of the contract or manifests an "intention wholly unexpressed in the writing" is barred.  Id. at 302.  A court should determine the meaning of the terms of a written contract before determining whether parol evidence contradicts those terms.  Fr. Winkler KG v. Stoller, 839 F.2d 1002, 1005 (3d Cir. 1988).

The plain words of the LOI prohibit Verseidag from hiring "the employees of Ultra-Flex set forth in Schedule C hereto."  There is no Schedule C.  A reading, without resort to extrinsic evidence, clearly indicates that Verseidag was not prohibited from hiring any Ultraflex employee at any time.  The only evidence Ultraflex advances to counter the plain meaning is the following deposition testimony from one of Verseidag's executives: "We had complained to Garland that we had no limitation on hiring people, but our lawyers had advised us to wait at least one year

---

[8]The Court need not address whether this contract was intended to be fully integrated for reasons that will become clear.

after signing the LOI." (Bellani Cert. Ex. UUU). As an initial matter, the Court accepts this evidence as not barred by the parol evidence rule since it is offered to explain what was intended by the absence of Schedule C, not to contradict or vary the provision. Nevertheless, the statement hurts Ultraflex more than it helps. It clearly indicates that Verseidag management understood the LOI not to cover any Ultraflex employees in the absence of a Schedule C. However, Verseidag's counsel prudently advised it to go beyond the express language so as to avoid an issue at a later date. The fact that Verseidag heeded the cautionary advice of its lawyers does not create the inference that Verseidag management understood this provision to cover all employees. This is especially true when coupled with testimony that expressly states that they had the opposite understanding. The Court finds Verseidag was not prohibited from hiring any Ultraflex employee at any time and therefore did not breach the no-hire provision of the LOI. Verseidag's motion for summary judgment on Count X is granted.

**H. Breach of Letter of Intent - Confidentiality/Due Diligence (XI)**

Count XI of the Complaint alleges that Verseidag breached the confidentiality provision in the due diligence clause of the LOI. Ultraflex did not respond in its opposing brief to Verseidag's arguments on this count. As noted above, when a plaintiff fails to defend a count of its complaint against a defendant's motion for summary judgment, it is considered abandoned. Damiano, 975 F. Supp. at 627 (granting summary judgment on the basis that motion considered unopposed); Rohm & Haas, 939 F. Supp. at 1161 (granting summary judgment on basis that plaintiff's argument was unopposed, and thus no genuine issue of material fact was created). Hence, summary judgment is appropriate as to Count XI.

**I.  Commissions Claims (XII)**

Ultraflex claims that it is owed commissions on all direct sales that Verseidag made from 1995 to 2000.  While admitting there was no written agreement to pay such commissions, Ultraflex presents parol evidence in the form of deposition testimony and correspondence between the parties to show there was an agreement to pay such commissions. (Bellani Cert. Ex. L-2; Ex. G; Ex. OOO 26-29; Ex. UUU 40-45; Rowland Cert. Ex. I at VERS-000905).  It also points out that Verseidag had paid about five percent commission on direct sales to three customers, MMT, Neschen and Vink, and says that this establishes a course of conduct evidencing an agreement. (Bellani Cert. Ex. G).

Verseidag first points out that there was no oral or written agreement to pay commissions on any direct sales, and that any oral agreement would be unenforceable under the statute of frauds.  It admits that it did pay commissions with respect to three customers, but argues that a previous course of conduct cannot establish an agreement.  Even if it could, it would only establish that there was an agreement with respect to sales to the three customers on which Verseidag actually paid commissions, and establishes nothing with regard to all other direct sales.

Verseidag heavily relies on a District of New Jersey case from 1987 for the proposition that the statute of frauds prevents recovery of commissions due under an oral agreement, particularly where terms of the alleged promise cannot be reasonably ascertained.  Kreuzburg v. Computer Sciences Corp., Commercial Services Div., 661 F. Supp. 877, 879 (D.N.J. 1987).  Turning to the statute of frauds provision upon which the case relied, N.J.S.A. § 25:1-5(e), reveals that subsection (e) was deleted in 1995.  That subsection previously stated that a written agreement was required for "[a]n agreement that is not to be performed within one year from the

making thereof."  N.J.S.A. § 25:1-5(e) (deleted by P.L. 1995, c. 360, § 8).

The Court has reviewed all of the evidence presented by the parties on this issue and the Court cannot conclusively determine that there was or was not an oral agreement between the parties to pay commissions on direct sales for all customers, in addition to the three mentioned. Ultraflex has identified specific evidence in the record upon which a verdict in its favor may be based.  Hence, summary judgment on the commissions claim is hereby denied.

## II. VERSEIDAG'S COUNTERCLAIM

The final issue is Verseidag's motion for partial summary judgment on its counterclaim for unpaid invoices for product it shipped to Ultraflex.  Verseidag claims it is owed 1,811,672.68 Deutsche Marks ("DM") (which it converts to $1,125,427.19 in its brief).  Acknowledging that there is a material dispute of fact over an amount that Ultraflex claims represents defective product, Verseidag asks for summary judgment with respect to the undisputed amount only.  In support of its claim, Verseidag submits invoices denominated in DM.  (Rowland Supp. Cert., Ex. I).  Verseidag's Amended Answer and Counterclaim also includes counterclaims on behalf of Leder Belting Canada, Ltd. ("Leder") for $114, 954.00 and Ammeraal Beltech, Inc. ("Ammeraal") for $50,080.76.  (Rowland Supp. Cert. Ex. C ¶¶ 123-124).  Both of these companies are wholly owned subsidiaries of Verseidag according to the Amended Answer and Counterclaim.  The record includes invoices denominated in dollars from these companies.  (Rowland Supp. Cert., Ex. I).

Ultraflex objects that Verseidag has not shown how the amount in the invoices converts to dollars.  It also argues that its unpaid commissions and defective product claims would more than offset any amount due, so that on balance it does not owe Verseidag anything.  Notably, it does

not explicitly say that there are not outstanding invoices in this amount, that it did not receive the goods named in the invoices, that they were returned, or that the invoices were paid. Finally, it specifies the amount of offset due to defective product at $204,783.57. (Plaintiffs' Brief at 38, directing attention to Affidavit of John Schleicher, Jr. ¶ 17). It is unclear to the Court what exchange rate Ultraflex is using to establish the amount of defective product it claims or which supplier they relate to. Verseidag has altered its request for partial summary judgment to $1,085,678.38 in order to reflect Ultraflex's specification.

The first issue is that Verseidag asserts counterclaims on behalf of two companies that are not parties to this action. Under Federal Rule of Civil Procedure 21, the Court can sua sponte join parties "at any stage of the action and on such terms as are just." Since these companies are wholly owned subsidiaries of Verseidag, and Verseidag has seen fit to assert counterclaims on their behalf, it does not appear unjust to join them so that they may assert their claims.

The Court concludes that it cannot fully grant defendant's motion for partial summary judgment under Rule 56(d) at this time because certain factual issues remain unclear. While Verseidag asserts in its Amended Answer and Counterclaim that it is owed 1,811,672.68 DM, it converts that to $1,125,427.19 using what it says was the rate at the close of business on February 19, 2003. This implies that the applicable conversion rate was 1 DM = .621208895 USD. In addition, some of the invoices have handwritten conversion rates written on them. These rates range from 1DM = .48 to .51 USD. Normally, the Court might take judicial notice pursuant to Federal Rule of Evidence 201. However, this does not seem appropriate here for three reasons. First, according to the Court's calculations, the applicable exchange rate on February 19, 2003

was 1 DM = .54933 USD.[9]  Using this rate, the 1,811,627.68 DM owed to Verseidag would

convert to $995,206.15.  Thus, it is unclear how Verseidag calculated its conversion.  Secondly,

February 19, 2003 appears to be an arbitrary date.  It is five days before Defendant filed its

moving brief, so it was likely chosen because it was the day Defendant wrote this section of the

brief.  Accordingly, the Court will not enter judgment before hearing from both parties as to the

correct rate of conversion and why the conversion date (or dates) chosen are appropriate.[10]

Additionally, although Ultraflex has specified $204,783.57 as the amount of its offset, it is

unclear how that offset is to be apportioned among the three claimants' invoices.  Also

problematic is that at least part of that amount must be attributed to Verseidag's invoices, which

were denominated in DM.  Ultraflex's offset is denominated in dollars, so there is an implied

exchange rate.  That rate must be consistent with the rate chosen to convert the invoices to dollars

in the first instance.

The Court will grant the motion for partial summary judgment with respect to the issue of

Ultraflex's liability for the amount of the invoices minus the amount of defective product claimed.

For the reasons detailed above, however, it is impossible to put a dollar amount on that liability at

---

[9]The Euro was introduced on January 1, 1999.  The Federal Reserve ceased publishing official dollar to Deutsche Mark rates as of that day and the Deutsche Mark was no longer legal tender as of December 31, 2001.  The Deutsche Mark is permanently fixed to the Euro at a rate of 1 EUR to 1.95583 DM.  (available at http://www.ecb.int/bc/intro/html/index.en.html). Therefore, the Deutsche Mark to dollar rate can only be determined by reference to the Euro to dollar rate on that day.  On February 19, 2003, 1 EUR = 1.0744 USD.  (Feb. 19, 2003 spot rate available at http://www.federalreserve.gov/releases/H10/hist/dat00_eu.txt).  Accordingly, by this Court's calculations, this yields a rate of 1 DM to .54933 USD.

[10]Given that exchange rates from the time of invoicing until now have varied wildly, the date of conversion could affect the amount of judgment by hundreds of thousands of dollars. Hence, it is necessary that the most appropriate date be determined.

this time.  Since the exchange rate issue is of a type that can be decided on a motion for partial summary judgment under Rule 56(d), the Court will permit Verseidag to file a renewed motion clarifying the issues of the proper exchange rate.[11]  Ultraflex will then be permitted to respond with its view of the proper exchange rate.  The motion should specify the exact amounts of defective product attributable to Verseidag, Leder, and Ammeraal, respectively.  The amounts attributable to Verseidag should be stated in DM and stated in USD for the other two parties.  The Court will then enter an order specifying the amount of Ultraflex's liability on that part of the counterclaim that represents non-defective product.

However, once these issues have been resolved, final judgment under Federal Rule of Civil Procedure 54(b) still will not be appropriate.  In order to certify under Rule 54(b) the district court must find that the decision is final "in the sense of an ultimate disposition of an individual claim entered in the course of a multiple claims action." Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436 (1956).  Consistently, the Third Circuit in Gerardi v. Pellulo, 16 F.3d 1363, 1369 (3d Cir. 1994) said that a Rule 54(b) certification is not appropriate unless the entire claim has been resolved.  The Gerardi court frowned on final judgments when they only respect "lesser included aspects within the greater recoveries still sought."  Still, the ultimate inquiry is whether the issues are "legally and factually separable."  U.S. Golf Ass'n v. St. Andrews Sys., Data-Max, Inc., 749 F.2d 1028 (3d Cir. 1984).

The Court concludes the counterclaim and claim for offsets due to defective product are not separable.  The value of defective product and the value of non-defective product are not

---

[11]Hicks v. Guinness, 269 U.S. 71, 80 (1925) suggests the proper exchange rate would be that prevailing at the time of breach.  The Court does not make any finding in this regard.

distinct issues.  Rather, they are closely related: the larger the former, the smaller the latter.

Although they can be artificially separated by conceding for purposes of the motion that there is a

certain amount of defective product, this does not remove the logical relation between the two

issues.

There is a second reason the Court believes it would be unwise to certify a final judgment

before the entire case has been resolved.  Before entering a Rule 54(b) final judgment, a court

must consider whether there is "no just reason for delay."  Fed. R. Civ. P. 54(b).  This means "a

district court must take into account judicial administrative interests as well as the equities

involved."  Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980).  The Third Circuit in

Sussex Drug Prods. v. Kanasco, Ltd., 920 F.2d 1150, 1156 (3d Cir. 1990), counseled district

courts against granting partial summary judgment under Rule 54(b) because of the risk of wasting

appellate judicial resources.  When there is an "interlock between the factual circumstances," the

development of a full factual record will assist the appellate court on appeal.  Gerardi, 16 F.3d at

1372.  Interests of judicial economy counsel that an appellate court not perform "piecemeal

appeals" on essentially the same facts.  When considering the equities, a "central factor" is the

existence of pending claims that "create the possibility of a setoff."  Curtiss-Wright Corp., 446

U.S. at 1.

Both factors point toward not certifying a final judgment under Rule 54(b).  An appellate

court reviewing a Rule 54(b) certification on a partial summary judgment would have to review

many of the same facts and legal issues later on in resolving the offset issue.  For example, the

invoices and exchange rates are central to both.  Additionally, the equities favor refraining from

entering final judgment.  While the record does not indicate that Ultraflex is financially unsound,

entry of an executable judgment of one million dollars or more could seriously threaten the ability of a relatively small business to continue to prosecute this action. Since Ultraflex has potentially meritorious claims outstanding after this motion, it would not be equitable to prejudice this ability. Further, those outstanding claims may well offset the amounts owing to Verseidag under the counterclaim. There is no reason that Verseidag should have its claim fulfilled before that of Ultraflex simply because they are more susceptible to resolution at the summary judgment stage. The Court is empowered to award interest on Verseidag's counterclaim at the conclusion of the case should it be warranted.

In conclusion, it is appropriate to grant partial summary judgment to Verseidag on the undisputed amount of liability. The Defendant is directed to submit a brief on the issue of the correct exchange rate and the appropriate damages. Plaintiffs will respond in kind and also specify the allocation of its claim for defective product among Verseidag, Ameraal, and Leder consistent with this Opinion and Order.

## C O N C L U S I O N

For the reasons stated herein, it is on this 30th day of March, 2006, hereby

**ORDERED** that Defendant Verseidag-Indutex GmbH's Motion [CM/ECF Docket Entry #52] for Summary Judgment as to Counts  I (Tortious Interference with Existing Business Relationships), II (Tortious Interference with Prospective Economic Benefits), III (Unfair Business Practices), IV (Breach of Express Distributorship Agreement), V (Improper Termination of Distributorship Relationship), VI (Breach of Covenant of Good Faith and Fair Dealing), Counts VII (Fraud), VIII (Unjust Enrichment), X (Breach of Letter of Intent - No Raid Provision), and XI (Breach of Letter of Intent - Confidentiality) is GRANTED; and it is further

**ORDERED** that Defendant Verseidag-Indutex GmbH's Motion [CM/ECF Docket Entry #52] for Summary Judgment as to Counts IX (Trademark Infringement) and XII (Commission Claims)  is DENIED; and it is further

**ORDERED** that Defendant Verseidag-Indutex GmbH's Motion [CM/ECF Docket Entry #52] for Partial Summary Judgment as to its Counterclaim is GRANTED as to the undisputed portion of liability and DENIED without prejudice as to damages; and it is further

**ORDERED** that the parties shall contact my Deputy Clerk, Lissette Rodriguez, to schedule a trial date for this matter.


DATED: March 30, 2006                          /s/ Jose L. Linares
                                               JOSE L. LINARES,
                                               UNITED STATES DISTRICT JUDGE